## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

**ANGELIA BROWN**
4329 Talmadge Circle
Suitland, MD 20746

**MICHAEL AND SHARLENE ELLIS**
4845 Legacy Drive
Colfax, NC 27235

**JOSEPH TAYLOR**
2551 Log Mill Court
Crofton, MD 21114

*Plaintiffs*,

v.

**EMERY FEDERAL CREDIT UNION**
7890 East Kemper Road
Cincinnati, OH 49867

    Serve on: Emery Federal Credit Union
           7890 East Kemper Road
           Cincinnati, OH 49867

*Defendant.*

Civil Action No.: _____

Judge _____

---

### COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs Angelia Brown, Michael and Sharlene Ellis and Joseph Taylor on behalf of themselves and the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt, LLC; Timothy F. Maloney and Veronica B. Nannis of Joseph, Greenwald and Laake, P.A.; and Gregory M. Utter and Melissa S. Matthews of Keating Muething & Klekamp, PLL file this Complaint, sue the Defendant for cause, claim damages, and state as follows:

- 1 -

## INTRODUCTION

1.    Plaintiffs Michael and Sharlene Ellis (the "Ellis Plaintiffs"), Angelia Brown ("Brown"), Joseph Taylor ("Taylor") and alleged Class Members are borrowers who currently have or had a residential mortgage loan originated or brokered by Emery Federal Credit Union ("Emery"), secured by residential real property.

2.    Plaintiffs, and alleged Class Members are victims of an illegal kickback scheme between Emery and All Star Title, Inc. ("All Star"), a Maryland-based title and settlement services company. The Ellis Plaintiffs, Taylor and Brown obtained loans from Emery through Emery loan production offices in Forest Hill and White Marsh, Maryland.

3.    Under the scheme, Emery receives and accepts illegal kickbacks in exchange for the assignment and referral of residential mortgage loans, refinances, and reverse mortgages to All Star for title and settlement services in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2607(a). Emery and All Star's illegal kickback arrangement will be referred to throughout this Complaint as the "Kickback Agreement".

4.    Emery and All Star laundered the kickbacks through third party marketing companies to conceal the illegal kickbacks and Kickback Agreement.

5.    To fund the illegal kickbacks, Emery and All Star conduct a related scheme to defraud Emery borrowers into paying fixed and fraudulent charges for title and settlement services, including amounts not associated with any legitimate title and settlement services. Indeed, borrowers are charged these amounts solely to pay for the illegal enterprise and the Kickback Agreement.

6.    Emery benefitted from the fixed and fraudulent charges for title and settlement services because these charges ensure the continued funding of the illegal kickback payments and

the Kickback Agreement.  These charges are financed into borrowers' loans, and Emery charges and earns interest from them.

7.      Emery and All Star  continuously and regularly use the U.S. Mail and interstate wires in furtherance of the Kickback Agreement and related scheme to defraud, willfully and intentionally engaging in a pattern of racketeering activity over a period of at least two-and-a-half years, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et. seq*.

8.      Emery and All Star fraudulently conceal the Kickback Agreement, related scheme to defraud and resulting fraudulent charges from Plaintiffs and alleged Class Members by, among other things: (i) laundering kickbacks through third-party marketing companies, (ii) creating sham invoice and payment records, (iii) making fraudulent representations in marketing materials, (iv) falsely allocating title and settlement fees and manipulating the APR associated with loans, and (v) making false and fraudulent representations and omissions in borrowers' loan documents. These concealments prevented borrowers, regulators, and auditors from discovering the kickbacks, the related scheme to defraud, and the injuries to borrowers therefrom, and allowed the kickbacks and fraudulent charges to continue.

## **PARTIES**

9.      Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

10.      Michael and Sharlene Ellis  are a married couple and citizens and residents of Guilford County, North Carolina. The Ellis' obtained the subject Emery loan from an Emery loan production office located in Forest Hill, Maryland.

11.     Angelia Brown is an unmarried woman and a citizen and resident of Prince George's County, Maryland. Brown obtained the subject Emery loan from an Emery loan production office located in White Marsh, Maryland.

12.     Joseph Taylor is an unmarried man and a citizen and resident of Anne Arundel County, Maryland. Taylor obtained the subject Emery loan from an Emery loan production office located in White Marsh, Maryland.

13.     Defendant Emery Federal Credit Union is a federally chartered credit union with its headquarters and principal place of business located in Cincinnati, Ohio, located in Hamilton County, Ohio. During the applicable time period, Emery was engaged in the business of consumer mortgage brokering, origination and/or lending, and otherwise transacted business in Maryland and elsewhere.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 18 U.S.C. § 1964(c).

15.     Plaintiffs have standing to bring their claims in this Court because they have suffered redressable  injuries in fact caused by Emery's conduct as pled herein.

16.     This Court has personal jurisdiction over the parties.  Personal jurisdiction over Emery is appropriate because during the time period alleged herein Emery continuously transacted business within this District,  and engaged in conduct that was directed at, and had the intended effect of causing injury to, persons residing in or located in this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2)and 18 U.S.C. § 1965.

## FACTUAL ALLEGATIONS

### I.     The All Star Kickbacks

18.     At all relevant times, All Star is a Maryland corporation and a title and settlement service provider licensed in Maryland and regulated by the Maryland Insurance Administration. All Star is a licensed title and settlement service provider in more than 30 states and provides title and settlement services on residential mortgage loans, refinances and reverse mortgages.

### A.     All Star begins paying kickbacks to mortgage lenders by 2008.

19.     By 2008, All Star designs and implements a scheme to pay residential mortgage lenders and brokers kickbacks in exchange for the assignment and referral of residential mortgage loans to All Star for title and settlement services.

20.     As an integral part of the scheme, All Star and a lender receiving All Star Kickbacks agree to launder the kickbacks through third-party marketing companies.

21.     All Star does not regularly use marketing companies for marketing services, nor does All Star regularly solicit borrowers. By contrast, residential mortgage lenders regularly use third-party marketing companies (such as direct mail, data and/or leads lists, telemarketing, or live transfer leads providers) to solicit borrowers to obtain residential mortgage loans, refinances, and reverse mortgages.

22.     A lender receiving kickbacks from All Star identifies a third-party marketing company that the lender is using for its marketing services.  All Star makes a kickback payment to the third-party marketing company, and the lender receives and accepts the kickback payment when All Star's payment is applied for the benefit of the lender's account.

23.     All Star's payment to the third-party marketing company is expressly and exclusively for the benefit of the lender and is made in exchange for the assignment and referral of loans under the kickback agreement.  In other words, All Star's payment to the third-party

marketing company is not for legitimate marketing services, and All Star receives no marketing services from the third-party marketing company.

24.　　All Star and the lenders receiving kickbacks regularly use the interstate mail and wires in furtherance of the kickback agreement, including regularly transmitting, receiving and accepting the illegal kickbacks over interstate wires.

25.　　The All Star Kickbacks tend to unnecessarily increase the amounts charged to borrowers for title and settlement services and are higher than the amounts charged to borrowers from lenders not receiving All Star Kickbacks for the same services ("Kickback Overcharge"). These unnecessary increases include amounts not associated with any legitimate title or settlement services that All Star and the lender agree to charge a lender's borrowers solely for the purpose of paying for the illegal kickbacks and other aspects of the illegal referring agreement.

26.　　Rob Selznick, a marketing representative for All Star, described the Kickback Overcharge in a 2010 email to a lender trying to determine whether to enter a kickback agreement with All Star:

> If you chose **NOT** to utilize All Star's Marketing Plan, the title fees will be at the agreed upon price of $1000 including title insurance. Any deals that you send to us that are in unlicensed states (not on the attached list), the fee structure will be $1000 **PLUS** Title Insurance. I think everyone was kind of in agreement that we most likely not be seeing these deals moving forward. All orders already placed will remain at the original agreed upon structure. This is for all new submissions moving forward.
>
> If you chose to **UTILIZE** All Star's Marketing Plan, the title fees will be determined on an individual basis based on past performance. All marketing must be done in licensed states. The marketing plan will move in 30 day windows. We want to keep the marketing completely uniform for everyone; therefore if you choose to market with us, we will pay for 2,000 pieces per week for 4 weeks or roughly $1000 per person, per week. The expected return for this investment will be 12 **CLOSED** loans before any more marketing continues. Hopefully, this is a short term bridge for you to be able to transfer to the plan above where you are covering your own marketing cost with lower title fees.

*See* Sept. 15, 2010 email from All Star marketing representative Rob Selznick attached as **Exhibit 1.**

27.     All Star unnecessarily increases the title and settlement service charges to borrowers to pay for the All Star Kickbacks.  All Star's practice of increasing title and settlement service charges to borrowers to pay for the kickbacks it is paying, causes injury in fact to the Plaintiffs and the class they seek to represent and is never reasonable. In addition, the unnecessary increase in the amounts charged for title and settlement services resulting from the All Star Kickbacks also causes these borrowers' title and settlement service charges to exceed amounts that are reasonable and customary.  These  are the very practices, and injuries, Congress sought to prevent when it passed the RESPA anti-kickback provisions.

28.     All Star and a lender receiving All Star Kickbacks also regularly use the interstate mails and wires to defraud and lure borrowers into paying the Kickback Overcharge and other fraudulent charges caused by the All Star Kickbacks.

29.      Lenders receiving All Star Kickbacks reinvest and use the All Star Kickbacks to create direct mail pieces such as postcards; letters;  mailers with perforated edges that the recipient rips or "snaps" open ("SNAP Packs"); and other printed materials that encourage borrowers to contact the lender and apply for a residential mortgage loan, refinance, or reverse mortgage.

30.     A  lender receiving All Star Kickbacks and All Star conspire and agree to include false representations on the lender's direct mail borrower solicitations, such as by stating that a potential borrower would save "30-40% on title fees" by using All Star.  The purpose of these false representations is to: (i) prevent a borrower from challenging a referral to All Star, (ii) conceal the Kickback Overcharge and other fraudulent charges resulting from funding the kickbacks, and (iii)

create the false representation that the charges to the borrower for title and settlement services would be lower than the charges from All Star competitors.

31.     The lender receiving the All Star Kickbacks and All Star cause these fraudulent solicitations to be sent through the interstate U.S. mails, in violation of 18 U.S.C. § 1341.

32.      Some lenders receiving All Star Kickbacks also solicit borrowers over the telephone and use interstate wires to make these telemarketing calls to potential borrowers in violation of 18 U.S.C. § 1343.

33.     Thousands of borrowers are lured in by these borrower solicitation techniques, coupled with a lender's assignment and referral of loans to All Star under the kickback agreement.

**B.     All Star and lenders receiving All Star Kickbacks use a web of concealments to hide the kickbacks and overcharges, and other fraudulent charges from borrowers, regulators, and auditors.**

34.     Intentional concealment from borrowers, regulators, and auditors is essential to the success and continuation of the All Star Kickbacks and the resulting Kickback Overcharges and other fraudulent charges funding the kickbacks.  Lenders receiving All Star Kickbacks and All Star use a variety of tactics to conceal the kickback agreement, Kickback Overcharges and other fraudulent charges, and the coordinated relationship between the lender and All Star under the kickback agreement.

35.     Laundering the kickbacks through third-party marketing companies is an integral part of the All Star Kickbacks—it allows All Star and a lender receiving All Star Kickbacks to conceal the fact and amount of kickbacks from borrowers, regulators, and law enforcement.  It also attempts to conceal the fact that any "thing of value" was exchanged between All Star and the lender receiving the All Star Kickbacks.

36.     In addition, All Star and the lender receiving the All Star Kickbacks launder the kickbacks through the third-party marketing companies to create the false impression that All Star is making payments for legitimate marketing services.  In fact, All Star does not receive any legitimate marketing services from the third-party marketing companies laundering the kickbacks. To be clear, All Star's payments laundered by the third-party marketing companies are solely for the benefit of the  lender receiving the All Star Kickbacks and in exchange for the lender's assignment and referral of loans under the kickback agreement, and not for the third-party marketing company's provision of any legitimate goods or services to All Star.

37.     To even further conceal the All Star Kickbacks and the kickback agreements, All Star and the lender receiving the All Star Kickbacks require the third-party marketing company to create "sham" invoices.  These invoices are a sham, in that they create the false impression that All Star is paying for and receiving legitimate marketing services from the third-party marketing company.  Again, All Star does not receive any legitimate marketing services from the marketing company, and All Star's payment is applied solely for the lender's benefit.

38.     All Star and the lender receiving All Star Kickbacks also make false and fraudulent representations and omissions in borrowers loan documents, including the Truth In Lending Act ("TILA") Disclosure, the Good Faith Estimate, the Direct Endorsement, and the HUD-1 Settlement Statement (the "HUD-1").

39.     Specifically, All Star and the lender receiving All Star Kickbacks agree to and do not identify the amounts associated with the Kickback Agreement or the Kickback Overcharges on any loan documents, including government-mandated disclosure forms such as the Good Faith Estimate and the HUD-1.

      **C.**    **All Star and lenders receiving All Star Kickbacks erect an elaborate co-marketing sham.**

40.    To add another layer of concealment, All Star and a lender receiving All Star Kickbacks create the false impression that All Star and the lender are participating in "co-marketing."

41.    During the applicable time period, "co-marketing" shams were so prevalent that the Consumer Financial Protection Bureau (the "CFPB")—the federal agency responsible for RESPA enforcement—issued a compliance bulletin stating that "[b]ased on the Bureau's investigative efforts, it appears that many [marketing service agreements] are designed to evade RESPA's prohibition on the payment and acceptance of kickbacks and referral fees."[1]

42.    In describing these types of co-marketing shams, the CFPB explained as follows:

> [I]n another matter that resulted in an enforcement action, **a title company entered into unwritten agreements with individual loan officers in which it paid for the referrals by defraying the loan officers' marketing expenses.** The title company supplied loan officers with valuable lead information and marketing materials. In exchange, the loan officers sent referrals to the title company. The lenders did not detect these RESPA violations and/or correct or prevent them, even when they had reason to know that the title company was defraying the marketing expenses of the lenders and their loan officers.

*Id.* (emphasis added). As described below, this co-marketing arrangement is virtually indistinguishable from the one designed by All Star and the lender receiving All Star Kickbacks.

43.    As part of the co-marketing sham, All Star and the lender receiving All Star Kickbacks agree to nominally include All Star on the lender's direct mail solicitations, such as direct mailers sent to borrowers. These solicitations are a sham, and fraudulent, because the lender

---

[1] Consumer Fin. Prot. Bureau Compliance Bulletin 2015-05, https://files.consumerfinance.gov/f/201510_cfpb_compliance-bulletin-2015-05-respacompliance-and-marketing-services-agreements.pdf.

requires, and All Star agrees, to purposefully design the mailers to prevent borrowers from contacting All Star and to ensure that borrowers will only contact the lender.

44.     For example, the lender receiving All Star Kickbacks deliberately omits any phone number, website, or contact information for All Star, so there is no chance that a borrower would contact All Star instead of the lender.

45.     The prototype for this co-marketing sham was developed by a postcard company contracted by All Star. The postcard company advised:

> We played around with the design a bit and what we're running into is that if we use 25-50% of the card with All Star Title's info, it makes it confusing for the person receiving the card as they can't tell who the advertisement is from. We came up with a mockup with a smaller All Star Title logo so that it doesn't totally distract from the mortgage company's information. We also removed your phone number because we don't want people to call you instead of the mortgage company.

*See* September 28, 2009 emails related to design of mailers attached as **Exhibit 2**.  In 2010, All Star notified the postcard company, "We actually started a similar program with other direct mail companies and its going really really well."  *See id.*

46.     Adopting this prototype, All Star and a lender receiving All Star Kickbacks agree that All Star will have a negligible presence on the solicitation, occupying 20 percent or less of the solicitation's surface area.  However, All Star's payment to the lender is not reasonably related to and is far greater than what an expected payment would be for such a nominal placement on the solicitation.  The inclusion of All Star is solely to attempt to conceal the All Star Kickbacks and kickback agreement.

47.     By design, then, All Star receives no actual marketing benefit from the solicitations, and all marketing benefits flow to the lender. In exchange, under the kickback agreement, the lender receiving the All Star Kickbacks agrees to exclusively assign and refer all loans generated

by the mailer to All Star for title and settlement services. Despite All Star's presence on the mailer, the only benefit All Star receives is the referral of loans from the lender.

48. These sham solicitations live up to their intended purpose. Despite laundering millions of dollars in payments to third-party marketing companies, All Star does not receive a single, direct call from borrowers as a result of these solicitations. Instead, All Star's business flows solely from loans assigned and referred from lenders as a result of the kickback payments.

> **D.** **All Star makes clear to lenders receiving All Star Kickbacks that the payments are for referrals of loans, and sets a "unit goal" of loan referrals before another kickback is paid.**

49. While creating the co-marketing sham, All Star makes clear to the lender receiving All Star Kickbacks that payments to the lender are solely for the assignment and referral of loans for title and settlement services.

50. Indeed, All Star expects a certain number of borrower referrals to come from each kickback payment, which it refers to as a "unit goal." As Jason Horwitz, the President and owner of All Star and the architect of the All Star Kickbacks, described it:

> …However, what we're going to do, and this will really apply to all marketing campaigns of any significant size, is basically put a "unit goal" on the mail drop. …the "unit goal" can be met with closings from the mail, or any other source. It doesn't matter where its from, as long as we hit that unit number. Basically the agreement would be that we do not contribute to another campaign until we hit that unit goal.

*See* June 22, 2011 email, attached as **Exhibit 3**.

51. In fact, All Star refuses to pay additional kickbacks unless a lender meets this "unit goal" requirement, and until the lender documents the number and value of loans referred to All Star under the kickback agreement. For example, in a communication to a lender receiving All Star Kickbacks, Horwitz lays down the law: **"Ok. Just so we're clear, I'm not dropping $1 more**

- 12 -

**until we close 25 NEW loans."** *See* February 6, 2013 email attached as **Exhibit 4** (capitalization in original and bold type added).

52.     In a similar communication, Horwitz wrote:

| From: | Jason |
|---|---|
| Sent: | Monday, October 11, 2010 2:48 PM EDT |
| To: | FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=Rob |
| Subject: | RE: Marketing |
| Attachments: | image001.jpg, image002.jpg, image003.jpg |

i dont give a fuck if the mailer bombed - just a heads up, I'm doing 4 drops for him, thats it, and getting the 12 deals. If they bitch about it or dont hold up to their end, i might be done doing marketing for them altogether

**From:** Rob Selznick
**Sent:** Monday, October 11, 2010 2:46 PM
**To:** Jason
**Subject:** FW: Marketing

**Exhibit 5**, Oct. 11, 2010 Email between All Star Owner J. Horwitz and All Star Marketing Manager R. Selznick. This email makes clear that marketing payments made by All Star are for the lender receiving All Star Kickbacks (i.e., "for them"), and that All Star is paying for the assignment and referral of loans from the lender, not for marketing services.

**II.      From 2011 to 2014, Emery accepts more than $300,000 in All Star Kickbacks and commits more than 200,000 predicate acts of mail and wire fraud in furtherance of the related scheme to defraud, causing borrowers on at least 1,710 Emery loans to be charged millions in fraudulent title and settlement service charges.**

53.     By at least 2011, Emery enters the Kickback Agreement, and agrees to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Emery loans to All Star for title and settlement services.

54. Over a period of two and a half years, All Star pays, and Emery receives and accepts, over 100 kickbacks totaling over $300,000.00 that are laundered by and through third-party marketing companies.

55. At all relevant times, the Emery branch managers, loan officers and other employees participating in the Kickback Agreement are licensed mortgage brokers and/or authorized loan officers, and at all relevant times were acting within the scope of the business relationship and their employment on behalf of Emery, specifically seeking borrowers and originating and securing loans for residential mortgages through Emery and/or brokering such loans through Emery to other lenders with whom Emery authorized, referring Emery borrowers to title companies, and working with title companies to close these loans. All activities, including any interaction with All Star, were for the benefit of Emery.

56. As detailed below, Emery participates in the All Star Kickbacks and related scheme to defraud borrowers related to at least eleven different Emery branches.

> **A.     Emery participates in the All Star Kickbacks and related scheme to defraud by and through the Emery White Marsh Branch.**

57. In or about August 2011, Emery opens an Emery branch at 7929 Honeygo Boulevard in White Marsh, Maryland 21236 (the "Emery White Marsh Branch").

58. Emery agrees to accept and receive kickbacks paid by All Star in exchange for the assignment and referral of Emery loans from the Emery White Marsh Branch to All Star for title and settlement services.

59. From 2011 through at least January 2014, and, on information and belief, longer, Emery receives and accepts over $50,000 in kickbacks from All Star for Emery loans assigned and referred to All Star from the Emery White Marsh Branch pursuant to the Kickback Agreement.

60.     Nearly all of the kickbacks that the Emery White Marsh Branch receives are laundered by and through various third-party marketing companies, including the following kickbacks:

a.      $154.50 kickback on October 27, 2011, laundered by and through Lendanear Data & Direct Mail Services ("Lendanear"), a Tennessee-based data and direct mail marketing company;

b.      $685.69 kickback on October 27, 2011, laundered by and through Influence Direct ("Influence Direct"), a Tennessee-based direct mail marketing company;

c.      $154.50 kickback on November 29, 2011, laundered by and through Lendanear;

d.      $1,417.62 kickback on January 12, 2012, laundered by and through Influence Direct;

e.      $167.44 kickback on February 8, 2012, laundered by and through Lendanear;

f.      $1,345.50 kickback on February 8, 2012, laundered by and through Influence Direct;

g.      $1,371.38 kickback on February 28, 2012, laundered by and through Influence Direct;

h.      $334.75 kickback on April 2, 2012, laundered by and through Lendanear;

i.      $1,371.38 kickback on April 4, 2012, laundered by and through Influence Direct;

j.      $334.75 kickback on May 2, 2012, laundered by and through Lendanear;

k.      $1,423.13 kickback on May 2, 2012, laundered by and through Influence Direct;

l.      $1,423.13 kickback on May 16, 2012, laundered by and through Influence Direct;

m.      $1,345.50 kickback on June 12, 2012, laundered by and through Influence Direct;

n.     $588.90 kickback on June 13, 2012, laundered by and through Influence Direct;

o.     $1,345.50 kickback on June 20, 2012, laundered by and through Influence Direct;

p.     $1,345.50 kickback on July 3, 2012, laundered by and through Influence Direct;

q.     $570.08 kickback on July 3, 2012, laundered by and through Influence Direct;

r.     $334.75 kickback on July 11, 2012, laundered by and through Lendanear;

s.     $1,423.13 kickback on July 11, 2012, laundered by and through Influence Direct;

t.     $1,345.50 kickback on July 11, 2012, laundered by and through Influence Direct;

u.     $595.79 kickback on July 11, 2012, laundered by and through Influence Direct.

v.     $563.93 kickback on July 18, 2012, laundered by and through Influence Direct;

w.     $618.15 kickback on August 1, 2012, laundered by and through Influence Direct;

x.     $334.75 kickback on August 14, 2012, laundered by and through Lendanear;

y.     $1,397.25 kickback on August 14, 2012, laundered by and through Influence Direct;

z.     $558.90 kickback on September 5, 2012, laundered by and through Influence Direct;

aa.    $581.26 kickback on September 12, 2012, laundered by and through Influence Direct;

bb.    $1,081.58 kickback on September 19, 2012, laundered by and through Influence Direct;

cc.  $633.23 kickback on September 26, 2012, laundered by and through Influence Direct;

dd.  $334.75 kickback on September 26, 2012, laundered by and through Lendanear;

ee.  $1,397.25 kickback on September 26, 2012, laundered by and through Influence Direct;

ff.  $572.87 kickback on October 17, 2012, laundered by and through Influence Direct;

gg.  $690.80 kickback on October 24, 2012, laundered by and through Influence Direct;

hh.  $584.00 kickback on November 7, 2012, laundered by and through Best Rate Referrals ("Best Rate"), a Nevada-based direct mail marketing company;

ii.  $334.75 kickback on November 7, 2012, laundered by and through Lendanear;

jj.  $1,397.25 kickback on November 12, 2012, laundered by and through Influence Direct;

kk.  $584.00 kickback on November 19, 2012, laundered by and through Best Rate;

ll.  $654.00 kickback on January 15, 2013, laundered by and through Best Rate;

mm.  $334.75 kickback on January 22, 2013, laundered by and through Lendanear;

nn.  $1,423.13 kickback on January 23, 2012, laundered by and through Influence Direct;

oo.  $666.20 kickback on February 5, 2013, laundered by and through Best Rate;

pp.  $334.75 kickback on February 22, 2013, laundered by and through Lendanear;

qq.  $1,423.13 kickback on February 26, 2013, laundered by and through Influence Direct;

      rr.    $853.88 kickback on March 19, 2013, laundered by and through Influence Direct;

      ss.    $607.96 kickback on April 3, 2013, laundered by and through Influence Direct;

      tt.    $334.75 kickback on April 9, 2013, laundered by and through Lendanear;

      uu.    $1,449.00 kickback on April 10, 2013, laundered by and through Influence Direct;

      vv.    $837.37 kickback on April 23, 2013, laundered by and through Influence Direct;

      ww.    $334.75 kickback on April 30, 2013, laundered by and through Lendanear;

      xx.    $1,449.00 kickback on May 1, 2013, laundered by and through Influence Direct;

      yy.    $775.39 kickback on May 1, 2013, laundered by and through Influence Direct; and

      zz.    $1,423.25 kickback on May 7, 2013, laundered by and through Influence Direct.

61.    The payments laundered through third-party marketing companies are for Emery's benefit and are directed to Emery expressly for the referral of Emery loans by the Emery White Marsh Branch to All Star for title and settlement services.  The reason these payments are laundered through third-party marketing companies is to conceal the illegal kickbacks.  In other words, the third-party marketing companies do not provide any goods or services to All Star.

62.    In addition, Emery receives the following kickbacks from All Star, in the form of untraceable gift cards:

      a.    Over $3,000 in gift cards to Emery White Marsh Branch employees in December 2012;

      b.    Over $2,000 in gift cards to Emery White Marsh Branch employees on or around April 17, 2013;

      c.      Over $4,000 in gift cards to Emery White Marsh Branch employees on or around June 19, 2013;

      d.      Over $4,000 in gift cards to Emery White Marsh Branch employees on or around July 19, 2013.

These kickbacks are evidenced on All Star's employee expense sheets, which refer to various Emery employees employed at the Emery White Marsh Branch.

63.      The payments laundered through gift cards are for Emery's benefit and are directed to Emery expressly for the referral of Emery loans by the Emery White Marsh Branch to All Star for title and settlement services. The reason these payments are laundered through gift cards is to conceal the illegal kickbacks.

64.      Emery chooses to use the All Star Kickbacks related to the Emery White Marsh Branch to produce and mail Emery solicitations to potential borrowers, including:

      a.  2,500 borrower solicitations on October 27, 2011;

      b.  2,634 borrower solicitation "SNAP Packs" on January 12, 2012;

      c.  2,500 borrower solicitation "SNAP Packs" on February 8, 2012;

      d.  2,500 borrower solicitations on February 28, 2012;

      e.  2,500 borrower solicitations on April 4, 2012;

      f.  2,500 borrower solicitations on May 1, 2012;

      g.  2,500 borrower solicitations on May 16, 2012;

      h.  5,000 borrower solicitations on June 12, 2012;

      i.  2,000 borrower solicitations on June 13 2012;

      j.  5,000 borrower solicitations on June 20, 2012;

      k.  5,000 borrower solicitations on July 3, 2012;

      l.  2,040 borrower solicitations on July 3, 2012;

      m.  2,500 borrower solicitations on July 11, 2012;

n.  5,000 borrower solicitations on July 11, 2012;

o.  2,132 borrower solicitations on July 11, 2012;

p.  2,018 borrower solicitations on July 18, 2012;

q.  2,212 borrower solicitations on August 1, 2012;

r.  5,000 borrower solicitations on August 15, 2012;

s.  1,000 borrower solicitations on September 9, 2012;

t.  1,040 borrower solicitations on September 12, 2012;

u.  1,045 borrower solicitations on September 19, 2012;

v.  1,133 borrower solicitations on September 26, 2012;

w.  5,000 borrower solicitations on September 27, 2012;

x.  1,025 borrower solicitations on October 17, 2012;

y.  1,236 borrower solicitations on October 24, 2012;

z.  1,000  borrower solicitations on November 7, 2012;

aa. 5,000 borrower solicitations on November 12, 2012;

bb. 1,000 borrower solicitations on November 19, 2012;

cc. 1,000 borrower solicitations on January 15, 2013;

dd. 5,000 borrower solicitations on January 23, 2013;

ee. 1,020 borrower solicitations on February 5, 2013;

ff.  5,000 borrower solicitations on February 26, 2013;

gg. 1,500 borrower solicitations on March 19, 2013;

hh. 1,068 borrower solicitations on April 3, 2013;

ii.  5,000 borrower solicitations on April10, 2013;

jj.  1,471 borrower solicitations on April 23, 2013;

kk. 5,000 borrower solicitations on May 1, 2013;

ll. 1,362 borrower solicitations on May 1, 2013; and

mm.     2,500 borrower solicitations on May 7, 2013.

65.     Emery sends these Emery solicitations through the interstate U.S. mails, with the solicitation being printed in one state and mailed to a potential borrower in another state. Emery mails these Emery solicitations to virtually every state in the contiguous United States and Canada.

66.     One purpose of the Emery solicitations is to generate loans to assign and refer to All Star in furtherance of the Kickback Agreement.

67.     At least some of the borrower solicitations include the fraudulent misrepresentations described in ¶ 30. *See* Emery Mailer attached as **Exhibit 6**.

68.     The representation in Emery's solicitation that the borrowers would "save 30-40% on your title fees by choosing All Star" is fraudulent and false because the prices Emery and All Star charge borrowers are not discounted or lower by any percent and in fact are higher and unnecessarily increased by the Kickback Overcharge and include amounts not associated with any legitimate title or settlement service and charged for the purpose of funding the illegal kickbacks.

69.     The representation in Emery's solicitation that it recommends All Star because its prices are lower is false and fraudulent because Emery is recommending All Star for the purpose of obtaining a kickback and in furtherance of the Kickback Agreement, and not for any reason associated with market-related pricing. In addition, during the relevant time Emery did not recognize any preferred vendors.

70.     One purpose of these fraudulent borrower solicitations is to defraud Emery borrowers into being charged and paying unnecessarily increased and fraudulent title and

settlement service fees, to fund the kickbacks, and to ensure that the Kickback Agreement continued and Emery continued to receive All Star Kickbacks.

71.     Around the same time that All Star begins paying kickbacks to the Emery White Marsh Branch, in December 2011, All Star and Emery conspire and agree to the following fixed charges: "$100-150[k]: $1,500; 150-200[k]: $1,600; 200-300[k]:$1,800; $300[k]+ :$2000" which "includes the application signing fees." *See* Dec. 8, 2011 e-mail between All Star and Brandon Hill ("Hill"), Emery White Marsh Branch loan processor manager and loan officer, attached as **Exhibit 7**. This agreement is memorialized by All Star in its January 3, 2012 Fee Spreadsheet, attached as **Exhibit 8**.

72.     These charges are unnecessarily increased by the All Star Kickbacks received and accepted by Emery related to loans assigned and referred from the Emery White Marsh Branch. These charges are $500 - $990 higher than the amount All Star charges borrowers from lenders who choose not to receive All Star Kickbacks. *See* **Ex. 1**. This amount is the minimum Kickback Overcharge incurred by Emery borrowers assigned and referred to All Star from the Emery White Marsh Branch in performance of the Kickback Agreement and actual damages caused by the related scheme to defraud and the pattern of racketeering activity undertaken in furtherance thereof.

73.     In addition and in the alternative, All Star admits that the fixed prices Emery agrees to allow All Star to charge borrowers on loans assigned and referred from the Emery White Marsh branch includes a "… 'marketing' fee…" unrelated to the performance of any legitimate title or settlement service, later identified as $200. *See* Oct. 10, 2012 email between All Star marketing representative R. Selznick and All Star owner J. Horwitz, attached as **Exhibit 9.** This amount is included in and/or one component of the Kickback Overcharge incurred by Emery borrowers

assigned and referred to All Star from the Emery White Marsh Branch in performance of the Kickback Agreement and the actual damages caused by the related scheme to defraud and the pattern of racketeering activity undertaken in furtherance thereof.

74.     Emery and All Star  perform the Kickback Agreement related to the Emery White Marsh Branch through at least January 2014, and, on information and belief, longer.  *See* Jan. 13, 2014 Title Fee Structure Chart, attached as **Exhibit 10**.

75.     More than 500 Emery loans, secured by real property in 42 states and the District of Columbia,  were assigned and referred from the Emery White Marsh Branch in furtherance of the Kickback Agreement. The borrowers on these loans are charged and pay the fraudulent charges for title and settlement services in furtherance of the related scheme to defraud.

> **B.     Emery participates in the All Star Kickbacks and the related scheme to defraud by and through the Emery Forest Hill Branch.**

76.     Emery additionally receives and accepts over $40,000 in All Star Kickbacks for loans assigned and referred to All Star from  its branch located at 350 Bynum Road, Forest Hill, Maryland 21050 ("Emery Forest Hill Branch").

77.     Emery receives and accepts All Star Kickbacks related to the Emery Forest Hill Branch laundered by and through various third-party marketing companies including:

    a.    $1,250.00 kickback on or around August 15, 2012, laundered by and through Azevedo Solutions Group Inc. ("Azevedo"), a California based marketing company;

    b.    $1,250.00 kickback on or around August 29, 2012, laundered by and through Azevedo;

    c.    $1,500.00 kickback on or around September 6, 2012, laundered by and through Azevedo;

    d.    $1,250.00 kickback on or around September 17, 2012,  laundered by and through Azevedo;

e.      $1,500.00 kickback on or around September 19, 2012, laundered by and through Azevedo;

f.      $1,125.00 kickback on or around October 1, 2012, laundered by and through Azevedo;

g.      $1,125.00 kickback on or around October 10, 2012, laundered by and through Azevedo;

h.      $750.00 kickback on or around October 15, 2012, laundered by and through Azevedo;

i.      $1,125.00 kickback on or around October 24, 2012, laundered by and through Azevedo;

j.      $2,250.00 kickback on or around November 12, 2012, laundered by and through Azevedo;

k.      $1,125.00 kickback on or around November 20, 2012, All Star pays a to Emery that is laundered by and through Azevedo;

l.      $1,125.00 kickback on or around December 19, 2012, laundered by and through Azevedo;

m.      $1,125.00 kickback on or around January 3, 2013, laundered by and through Azevedo;

n.      $1,125.00 kickback on or around January 8, 2013, laundered by and through Azevedo;

o.      $1,125.00 kickback on or around January 8, 2013, laundered by and through Azevedo;

p.      $1,500.00 kickback on or around January 23, 2013, laundered by and through Azevedo;

q.      $750.00 kickback on or around January 23, 2013, laundered by and through Azevedo;

r.      $750.00 kickback on or around January 23, 2013, laundered by and through Azevedo;

s.      $750.00 kickback on or around February 13, 2013, laundered by and through Azevedo;

t.      $750.00 kickback on or around February 13, 2013, laundered by and through Azevedo;

u.      $1,125.00 kickback on or around February 19, 2013, laundered by and through Azevedo;

v.      $1,125.00 kickback on or around February 22, 2013, laundered by and through Azevedo;

w.      $1,000.00 kickback on or around February 26, 2013, laundered by and through Azevedo;

x.      $1,125.00 kickback on or around February 26, 2013, laundered by and through Azevedo;

y.      $1,125.00 kickback on or around April 3, 2013, laundered by and through Azevedo;

z.      $1,300.00 kickback on or around April 10, 2013, laundered by and through Azevedo;

aa.     $1,250.00 kickback on or around April 10, 2013, laundered by and through Azevedo;

bb.     $2,400.00 kickback on or around April 16, 2013, laundered by and through Azevedo;

cc.     $1,250.00 kickback on or around April 23, 2013, laundered by and through Azevedo;

dd.     $625.00 kickback on or around May 15, 2013, laundered by and through Azevedo;

ee.     $750.00 kickback on or around June 7, 2013, laundered by and through Azevedo;

ff.     $625.00 kickback on or around June 20, 2013, laundered by and through Azevedo;

gg.     $1,562.50 kickback on or around June 20, 2013, laundered by and through Azevedo;

hh.     $625.00 kickback on or around July 23, 2013, laundered by and through Azevedo; and

ii.     $500.00 kickback on or around July 30, 2013, laundered by and through Raza Media, LLC dba MortgageLeads.org ("MortgageLeads"), a Nevada-based direct mail marketing and leads company.

78.     The payments laundered through third-party marketing companies are for Emery's benefit and are directed to Emery expressly for the referral of Emery loans by the Emery Forest Hill Branch to All Star for title and settlement services.  The reason these payments are laundered through third-party marketing companies is to conceal the illegal kickbacks.  In other words, the third-party marketing companies do not provide any goods or services to All Star.

79.     Emery chooses to reinvest and use the All Star Kickbacks associated with the Emery Forest Hill Branch to receive live transfer telemarketing calls from potential borrowers, including:

a.  Live transfer telemarketing calls on or around September 6, 2012;

b.  Live transfer telemarketing calls on or around September 17, 2012;

c.  Live transfer telemarketing call on around September 19, 2012;

d.  Live transfer telemarketing calls on or around October 1, 2012;

e.  Live transfer telemarketing calls on or around October 10, 2012;

f.  Live transfer telemarketing calls on or around October 15, 2012;

g.  Live transfer telemarketing calls on or around October 24, 2012;

h.  Live transfer telemarketing calls on or around November 12, 2012;

i.  Live transfer telemarketing call on or around November 20, 2012;

j.  Live transfer telemarketing calls on or around December 19, 2012;

k.  Live transfer telemarketing calls on or around January 3, 2013;

l.  Live transfer telemarketing calls on or around January 8, 2013;

m.  Live transfer telemarketing calls on or around January 23, 2013;

n.  Live transfer telemarketing calls on or around February 13, 2013;

o.  Live transfer telemarketing calls on or around February 19, 2013;

     p.   Live transfer telemarketing calls on or around February 22, 2013;

     q.   Live transfer telemarketing calls on or around February 26, 2013;

     r.   Live transfer telemarketing calls on or around April 3, 2013;

     s.   Live transfer telemarketing calls on or around April 10, 2013;

     t.   Live transfer telemarketing calls on or around April 16, 2013;

     u.   Live transfer telemarketing calls on or around April 23, 2013;

     v.   Live transfer telemarketing calls on or around May15, 2013; and

     w.   Live transfer telemarketing calls on or around June 7, 2013.

80.    Emery receives these live transfer calls over interstate wires with the borrower in one state placing a call to a centralized call center in another state, and the call center transferring the call to the Emery Forest Hill branch in a third state, Maryland.

81.    One purpose of these live transfer calls is to generate the loans that Emery can assign and refer to All Star to meet Emery's obligations under the Kickback Agreement, and also to generate borrowers Emery and All Star can defraud into being charged and paying the fraudulent charges that are the purpose of the related scheme to defraud and the pattern of racketeering undertaken in furtherance thereof.

82.    By January 2012, All Star and the Emery Forest Hill Branch conspire and agree to the following fixed charges: $1,200 including title insurance and an application signing fee for loans closed in licensed states, and $1,000 plus title insurance for loans closed in unlicensed states. In addition, All Star and Emery agree to charge a $150 Application Signing Surcharge. *See* **Ex. 8**.

83.    These charges are unnecessarily increased by the All Star Kickbacks received and accepted by Emery related to loans assigned and referred from the Emery Forest Hill Branch.

These charges are $200 higher than All Star charges borrowers assigned and referred from lenders that are not receiving All Star Kickbacks. *See* **Ex. 1**. This amount is the minimum Kickback Overcharge incurred by Emery borrowers assigned and referred to All Star from the Emery Forest Hill Branch in performance of the Kickback Agreement and actual damages caused by the related scheme to defraud and the pattern of racketeering activity undertaken in furtherance thereof.

84.     In addition, Emery and All Star agree that any fee "overages" - fees above the agreed fixed price of $1200 - would be returned by Emery as kickbacks. So, for example, four loans assigned and referred to All Star under the Kickback Agreement by Gary Becker, a loan officer employed by Emery in the Emery Forest Hills branch, were charged "overages" of $350-500 and those "overages" were returned as a kickback to Emery on or around July 24, 2012, and laundered through third-party marketing company Azevedo. *See*, July 24, 2012 emails between All Star marketing representative Rob Selznick, All Star Owner Jason Horwitz and Emery loan officer Gary Becker and attached spreadsheet documenting overages charged to Emery borrowers, attached as **Exhibit 11**.

85.     These overages are a component of the Kickback Overcharges incurred by Emery borrowers assigned and referred to All Star from the Emery Forest Hill Branch in performance of the Kickback Agreement and actual damages caused by the related scheme to defraud and the pattern of racketeering activity undertaken in furtherance thereof.

86.     The Emery Forest Hill Branch and All Star agree to and perform the Kickback Agreement through at least January 2014, and, on information and belief, longer. *See* **Ex. 10**.

87.     The Emery Forest Hill Branch assigns and refers more than 500 Emery loans, secured by real property in 45 states and the District of Columbia, pursuant to the Kickback

Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof.

    **C.    Emery participates in the All Star Kickbacks and related scheme to defraud by and through the Emery San Diego Branch.**

    88.    Beginning in April 2012, Dan Rebello is a loan officer employed by Emery and operates an Emery branch located 555 West Beech Street in San Diego, California 92101 ("Emery San Diego Branch").

    89.    As with the Emery White Marsh and Forest Hill Branches, Emery receives and accepts All Star Kickbacks in exchange for the assignment and referral of Emery loans, refinances, and reverse mortgages from the Emery San Diego Branch to All Star for title and settlement services.

    90.    Beginning in April 2012 and continuing through 2013, Emery receives and accepts over $250,000 in All Star Kickbacks related to loans assigned and referred from the Emery San Diego Branch pursuant to the Kickback Agreement.

    91.    Emery receives and accepts more than $250,000 in All Star Kickbacks related to the Emery San Diego branch and laundered through third party marketing companies, including:

        a.    $2,266.82 kickback on or around April 24, 2012, laundered by and through Lendanear;

        b.    $10,439.46 kickback on or around April 25, 2012, laundered by and through Influence Direct;

        c.    $1,885.58 kickback on or around June 5, 2012, laundered by and through Lendanear;

        d.    $5,692.50 kickback on or around June 6, 2012, laundered by and through Influence Direct;

        e.    $2,277.00 kickback on or around June 29, 2012, laundered by and through Influence Direct;

f.      $1,653.67 kickback on or around July 11, 2012, laundered by and through Influence Direct;

g.      $2,209.22 kickback on or around August 1, 2012, laundered by and through Lendanear;

h.      $10,175.34 kickback on or around August 1, 2012, laundered by and through Influence Direct;

i.      $3,040.56 kickback on or around September 19, 2012, laundered by and through Lendanear;

j.      $15,366.90 kickback on or around September 19, 2012, laundered by and through Influence Direct;

k.      $4,130.60 kickback on or around or around November 9, 2012, laundered by and through Lendanear;

l.      $16,832.45 kickback on or around November 28, 2012, laundered by and through Influence Direct;

m.      $6,161.31 kickback on or around January 2, 2013, laundered by and through Lendanear;

n.      $29,924.35 kickback on or around January 3, 2013, laundered by and through Influence Direct;

o.      $7,910.40 kickback on or around January 25, 2013, laundered by and through Lendanear;

p.      $38,419.20 kickback on or around January 28, 2013, laundered by and through Influence Direct;

q.      $3,897.46 kickback on or around February 25, 2013, laundered by and through Lendanear;

r.      $41,600.79 kickback on or around February 26, 2013, laundered by and through Influence Direct;

s.      $6,276.90 kickback on or around March 26, 2013, laundered by and through Lendanear;

t.      $32,416.20 kickback on or around March 26, 2013, laundered by and through Influence Direct; and

u.      $1,236.00 kickback on or around May 21, 2013, laundered by and through Lendanear.

92.    Emery chooses to reinvest and use the All Star Kickbacks related to the Emery San Diego Branch, to produce and mail to borrowers fraudulent Emery solicitations, including:

      a.   36,679 borrower solicitations on or around April 25, 2012;

      b.   20, 000 borrower solicitations on or around June 6, 2012;

      c.   8,000 borrower solicitations on or around June 29, 2012;

      d.   5,809 borrower solicitations on or around July 11, 2012;

      e.   35,750borrower solicitations on or around August 1, 2012;

      f.   44, 992 borrower solicitations on or around September 19, 2012;

      g.   28,532 borrower solicitations on or around November 28, 2012;

      h.   62,311 borrower solicitations on or around January 1, 2013;

      i.   80,000 borrower solicitations on or around January 28, 2013;

      j.   83,158 borrower solicitations on or around February 26, 2013; and

      k.   67,500 borrower solicitations on or around March 26, 2013.

93.    Emery chooses to send these fraudulent Emery solicitations through the interstate U.S. mail to borrowers in virtually every U.S. state. These fraudulent Emery solicitations contain the same or substantially similar false and fraudulent Emery solicitations to potential borrowers that are described in ¶ 30, 67-70. *See also,* **Ex. 6.**

94.    At the same time Emery receives and accepts All Star Kickbacks related to Emery loans assigned and referred from the Emery San Diego Branch, All Star and Emery conspire to and agree to the following fixed charges: "$900 plus title" for all loans in non-attorney states and "$1,200 plus title" for loans closed in attorney states. *See* Apr. 12, 2012 e-mail, attached as **Exhibit 12**.

95.     These charges are unnecessarily increased by the All Star Kickbacks Emery receives and accepts from All Star related to loans assigned and referred by the Emery San Diego branch. These charges are at least $200 higher than All Star is charging borrowers related to lenders that are not receiving All Star Kickbacks. *See* **Ex. 1**. This amount is the minimum Kickback Overcharge incurred by Emery borrowers assigned and referred to All Star from the Emery San Diego Branch in performance of the Kickback Agreement, and actual damages caused by the related scheme to defraud and pattern of racketeering activity undertaken in furtherance thereof.

96.     In addition and in the alternative, All Star admits that the fixed prices Emery agrees to allow All Star to charge borrowers on loans assigned and referred from the Emery White Marsh branch includes a marketing fee unrelated to the performance of any legitimate title or settlement service of at least $320. *See* Mar. 29, 2012 email from All Star owner Jason Horwitz to Emery San Diego Branch manager Daniel Rebello attached hereto as **Exhibit 13.**  This amount is included in or a component of the Kickback Overcharge incurred by Emery borrowers assigned and referred to All Star from the Emery San Diego Branch in performance of the Kickback Agreement and actual damages caused by the related scheme to defraud and pattern of racketeering activity undertaken in furtherance thereof.

97.     The Emery San Diego Branch assigns and refers at least 240 Emery loans, secured by real property in at least 25 states, pursuant to the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof.

     **D.     Emery participates in All Star Kickbacks and the related scheme to defraud by and through other Emery branches.**

98.     Emery and All Star agree to charge fixed and fraudulent prices to Emery borrowers assigned and referred from the following Emery branches:

a.     the 8600 Lasalle Road Towson, Maryland branch employing Michael Belt, Mike Meeks, Robert Tacelosky, Howard Shipley, Anthony Miller, Martha Gatewood-Bell, John Bell, and Kimber Fog;

b.     the "1 West Chase Street Branch" managed by Emery loan officer Adam Ellis;

c.     the "Vale Road Branch" managed by Emery loan officer Angela Pobletts;

d.     the "New Jersey Branch" managed by Emery loan officer Brian Kelly;

e.     the "Owings Court Branch" managed by Emery loan officer Adam Mandelberg;

f.     the "Bel Air Branch" managed by Emery loan officer John Hauck;

g.     the "Norcross (GA) Branch" managed by Emery loan officer Allan Wiggins;

h.     the "Cherokee (GA) Branch" managed by Emery loan officer Chad Bonadona; and

i.     the "Weatherstone (GA) Branch" managed by Emery loan officer Larry Lynn.

99.     Based on Emery and All Star's continuing pattern of practice and these pricing agreements, Plaintiffs believe and therefore allege that Emery receives and accepts All Star Kickbacks related to Emery loans assigned and referred from these Emery branches.

100.     Collectively, these various branches assigned and referred more than 430 loans—affecting loan transactions secured by real property in 39 states—to All Star for title and settlement services in performance of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof.

101.     Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star and Emery conspire to and fix prices for title and settlement services associated with loans assigned and referred to All Star by additional known and unknown Emery Branches, branch managers, and loan officers in performance of the Kickback

Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof.

102.     Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that Emery receives and accepts All Star Kickbacks in exchange for Emery's assignment and referral of loans from additional known and unknown Emery branches, branch managers, and loan officers in furtherance and performance of the Kickback Agreement, including but not limited to Emery loan officers Steve Greathouse, Daryl Kalb, Chad Hiteshew, Mike Pfeil, Amy Pfeil, Mark Tonti, and Mark Thoner.

103.     Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe and therefore aver that every loan that Emery assigned and referred to All Star from the period of January 1, 2011 through December 31, 2014 was subject to the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof.

104.     Based on the continuing pattern of practice between All Star and Emery, Plaintiffs believe, and therefore aver, that All Star pays kickbacks to Emery laundered by and through other third-party marketing companies in addition to those identified herein and in other forms in addition to those identified herein.

105.     As a result of the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity undertaken in furtherance of the related scheme to defraud, Emery borrowers, including Plaintiffs and alleged Class Members, are harmed because they are: (i) defrauded into being charged and paying higher and fixed charges for title and settlement services than they would have been charged and paid without the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity undertaken in furtherance thereof; (ii) are

defrauded into being charged and paying fraudulent charges for title and settlement services including amounts not associated with any legitimate title or settlement service and charged for the sole purpose of funding illegal kickbacks; (iii) denied kickback-free title and settlement services; and (iv) denied their choice of title and settlement service provider and other consumer benefits of a competitive marketplace.

106.    No goods, facilities or services are provided by any Emery employee and/or agent associated with the receipt and acceptance of the All Star Kickbacks.  The payment by All Star and the receipt and acceptance by Emery of the kickbacks were made expressly and  solely for the assignment and referral by Emery of Emery borrowers to All Star.

107.    In furtherance of the "co-marketing" sham integral to the All Star Kickbacks, All Star is nominally included in Emery borrowers solicitations identified above and at other times not included.  But, consistent with All Star's early prototypes, advice to other lenders receiving All Star Kickbacks, and the overall co-marketing sham, no phone number for other contact information is included in any Emery solicitation and All Star is included in only a nominal way, if at all. See **Ex. 6**.

108.    True to its design and intent, All Star does not receive any marketing benefit from any Emery solicitation. Instead, borrowers contact Emery branch managers, loan officers and other employees who assign and refer the Emery borrower's loan to All Star under the Kickback Agreement and for the purpose of receiving the next All Star Kickback.

109.    In addition, and in the alternative, any payment from All Star to Emery is not reasonably related to the value of any good, facility or service that may have been provided by Emery to All Star.  As Jason Horwitz, All Star's owner and mastermind of the All Star Kickbacks, recognized with another lender receiving All Star Kickbacks:

On Mar 4, 2010, at 3:59 PM, "Jason" <jason@allstartitleinc.com> wrote:

> haha, uhh i was thinking the All Star part was a little more visible...lol i almost couldnt find it!
> Maybe next time we'll see how we can change it to maybe make our portion a little bigger or
> something...

**From:** Angela Pobletts [mailto:Angela.Pobletts@enmcdirect.com]
**Sent:** Thursday, March 04, 2010 3:46 PM
**To:** Jason
**Subject:** Fwd: Eagle Proof 35163 revision 3

Mar. 4, 2010 email between loan officer Angela Pobletts and All Star Owner Jason Horwitz, attached as **Exhibit 14.**

**FACTUAL ALLEGATIONS RELATED TO
THE INDIVIDUAL CLASS REPRESENTATIVES**

**I.      Mr. and Mrs. Ellis' Emery Loan**

110.    In or around June 2012, the Ellis Plaintiffs obtain a residential mortgage loan from Emery through Michael Varlotta, a mortgage loan originator employed by Emery at the Emery Forest Hill Branch, in relation to the refinance of residential real property located at 4845 Legacy Drive, Colfax, North Carolina, 27235.  The Ellis Plaintiffs' Emery loan closes on or around July 24, 2012.

111.    Michael Varlotta assigns and refers the Ellis Plaintiffs' loan to All Star as quid pro quo for kickbacks All Star paid to Emery, as described in ¶ 77, thereby performing the Kickback Agreement, depriving the Ellis Plaintiffs of their choice of title and settlement service provider, and denying the Ellis Plaintiffs kickback-free title and settlement services.

112.    Based on Emery and All Star's continuing pattern or practice, and agreements related to charges for title and settlement services on loans assigned and referred to All Star from the Emery Forest Hill Branch, the Ellis Plaintiffs believe, and therefore allege, that All Star charges the Ellis Plaintiffs at least $1200  in total title and settlement service fees.  The price for title and

settlement service fees All Star charges the Ellis Plaintiffs are higher than the same charges would have been without the Kickback Agreement and the pattern of racketeering activity All Star and Emery perform in furtherance of the related scheme to defraud.

113. The charges for title and settlement services that Emery and All Star agree to allow All Star to charge the Ellis Plaintiffs exceed what is reasonable and customary for similar transactions in North Carolina in violation of 24 C.F.R. § 203.27.

114. These title and settlement service fees include the Kickback Overcharge described in ¶¶ 82-85 which is the minimum amount of the Ellis Plaintiffs' actual damages proximately caused by the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

115. All Star disburses proceeds from the Ellis Plaintiffs' Emery loan in payment of these title and settlement service charges as reflected on the Ellis Plaintiffs' HUD-1.

116. As a direct and proximate result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, the Ellis Plaintiffs are harmed because they are: (i) charged and pay more for title and settlement services than they would have paid without the illegal Kickback Agreement, related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof; (ii) defrauded into being charged and paying fraudulent charges for title and settlements service fees including amounts that are not associated with any legitimate title or settlement service and charged for the sole purpose of funding illegal kickbacks; (iii) stripped of their choice of title and settlement service provider and their mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

117.     As a direct and proximate result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, the Ellis Plaintiffs suffer actual damages in the amount of at least $200 and, on information and belief, additional amounts.

### II.     Ms. Brown's Emery Loan

118.     In or around March 2012, Brown obtained a residential mortgage loan from Emery through Brandon Hill, a mortgage loan originator employed by Emery at the Emery White Marsh Branch, in relation to the refinance of residential property located at 4329 Talmadge Circle, Suitland, Maryland 20746. Brown's Emery loan closes on or around April 1, 2012.

119.     Brandon Hill assigns and refers Brown's loan to All Star as quid pro quo for kickbacks All Star paid to Emery, as described in ¶64, thereby performing the Kickback Agreement, depriving Brown of her choice of title and settlement service provider, and denying Brown kickback-free title and settlement services.

120.     Based on Emery and All Star's continuing pattern of practice, and agreements related to charges for title and settlement services on loans assigned and referred to All Star from the Emery White Marsh Branch, Brown believes, and therefore alleges, that All Star charges Brown at least $1,900 in total title and settlement service fees. *See* Brown HUD-1 attached as **Exhibit 19.**  The price for title and settlement service fees All Star charges Brown is higher than the same charges would have been without the Kickback Agreement and the pattern of racketeering activity All Star and Emery perform in furtherance of the related scheme to defraud.

121.     The charges for title and settlement services that Emery and All Star agree to allow All Star to charge Brown, exceed what is reasonable and customary for similar transactions in Maryland in violation of 24 C.F.R. § 203.27.

122.    These title and settlement service fees include the Kickback Overcharge described in ¶¶ 72-75 which is the minimum amount of Brown's actual damages proximately caused by the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

123.    All Star disburses proceeds from Brown's Emery loan in payment of these title and settlement service charges as reflected on Brown's HUD-1. **Ex. 19.**

124.    As a direct and proximate result of the Kickback Agreement, the related scheme to defraud and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, Brown is harmed because she is: (i) charged and pays more for title and settlement services than she would have paid without the illegal Kickback Agreement, related scheme to defraud and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof; (ii) defrauded into being charged and paying fraudulent charges for title and settlement service fees including amounts that are not associated with any legitimate title or settlement service and charged for the sole purpose of funding illegal kickbacks; (iii) stripped of her choice of title and settlement service provider and her mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

125.    As a direct and proximate result of the Kickback Agreement, the related scheme to defraud and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, Brown suffers actual damages in the amount of at least $200-$900 and, upon information and belief, additional amounts.

**III.    Mr. Taylor's Loan**

126.     In or around April 2012, Taylor obtains a residential mortgage loan from Emery through Joseph Farinetti, a mortgage loan originator employed by Emery at the Emery White Marsh Branch, in relation to the refinance of residential real property located at 2551 Log Mill Court, Crofton, Maryland 21114. Taylor's loan closes on or around April 10, 2012.

127.     Joseph Farinetti assigns and refers Taylor's loan to All Star as quid pro quo for kickbacks All Star paid to Emery, as described in ¶ 64, thereby performing the Kickback Agreement, depriving Taylor of his choice of title and settlement service provider, and denying Taylor kickback-free title and settlement services.

128.     All Star charges Taylor $1,800 in total title and settlement service fees. *See* Taylor HUD-1 attached as **Exhibit 21.**   The price for title and settlement service fees All Star charges Taylor are higher than the same charges would have been without the Kickback Agreement and the pattern of racketeering activity All Star and Emery perform in furtherance of the related scheme to defraud.

129.     The charges for title and settlement services that Emery and All Star agree to allow All Star to charge Taylor exceed what is reasonable and customary for similar transactions in Maryland in violation of 24 C.F.R. §203.27.

130.     These title and settlement service fees include the Kickback Overcharge described in ¶¶ 72-75 which is the minimum amount of Taylor's actual damages proximately caused by the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

131.     All Star disburses proceeds from Taylor's Emery loan in payment of these title and settlement service charges as reflected on Taylor's HUD-1.

132.     As a direct and proximate result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, Taylor is harmed because he is: (i) charged and pays more for title and settlement services than he would have paid without the illegal Kickback Agreement, related scheme to defraud and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof; (ii) defrauded into being charged and paying fraudulent charges for title and settlement service fees including amounts that are not associated with any legitimate title or settlement service and charged for the sole purpose of funding illegal kickbacks; (iii) stripped of his choice of title and settlement service provider and his mortgage broker's impartial evaluation of All Star's service and quality; and (iv) deprived of kickback-free title and settlement services and the consumer benefits of fair competition among independent title and settlement service providers.

133.     As a direct and proximate result of the Kickback Agreement, the related scheme to defraud and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof, Taylor suffers actual damages in the amount of at least $200-$ 500, and, on information and belief, additional amounts.

### FACTUAL ALLEGATIONS RELATED TO LIMITATIONS

134.     Essential to the All Star Scheme, Emery and All Star undertook affirmative acts that fraudulently concealed the Kickback Agreement, the resulting kickbacks and fixed  and fraudulent charges, and the actual injury and damages to borrowers, including Plaintiffs.

**I.      All Star and Emery Launder the Kickbacks Through Third-Party Marketing Companies and Use Sham Invoices and Payment Records to Conceal the Kickbacks from Borrowers, Auditors, and Regulators.**

135.     As described above, Emery and All Star conceal the fact and payment of kickbacks by laundering kickbacks through third-party marketing companies.  Emery and All Star further

conceal the illegal kickbacks and Kickback Agreement through the creation of sham invoices and sham payment records.

136.     All Star's and Emery's concealment efforts prevent discovery of the fact that any "thing of value" is exchanged between Emery and All Star related to the assignment and referral of Emery loans, including Plaintiffs' loan, the actual payment and receipt and acceptance of illegal kickbacks, and Emery's coordinated business relationship with All Star.

### II.     Emery and All Star Falsely Allocate Fees and Manipulate the APR.

137.     TILA mandates that lenders report to borrowers the Annual Percentage Rate, or "APR", associated with a loan, refinance, or reverse mortgage.  While the interest rate of a loan is the cost to borrow the principal loan amount, the APR includes both the interest rate of the loan plus certain other lender fees, such as origination fees, discount points and some closing costs, including some title and settlement service fees.  The APR is intended as a tool for borrowers to compare, among other things, closing and settlement costs across loans with similar interest rates and to easily identify when one loan has substantially higher fees than another loan at the same interest rate.  Lenders are required to report to borrowers a calculation of the APR on various loan documents, including the TILA disclosure.

138.     The title and settlement service fees that are excluded in the APR calculation are defined by TILA.  12 C.F.R. § 1026.4(c). Because some fees are excluded from the APR (and others are not), title and settlement service companies and lenders can manipulate—and falsely minimize—the APR by falsely allocating amounts charged for title and settlement services to those categories of fees that are excluded from the APR calculation.

139.     As a regular and continuing business practice, Emery and All Star allocate the charges for title and settlement services associated with a borrower's loan only to those categories

of title services not included in the APR, thereby falsely minimizing the APR reported on borrowers' loan documents and required federal disclosures.

140.    For example, fees for "Title Examination", "Abstract of Title", and "Title Insurance" are excluded from the APR calculation—*see* 12 C.F.R. § 1026.4(c)(7)(i)—while a settlement or closing fee, or an application signing fee, is a settlement service cost required to be included in the APR calculation.  *See* 12 C.F.R. § 1026.4(a)(1)(i).  By allocating the charges associated with conducting a settlement or closing with a borrower to the category of "title exam" or "abstract" the result is a false, and falsely minimized, APR.

141.    All Star claims the false allocation of fees and manipulation of the APR as a regular business practice as early as 2011 and at least through October 2015, allocating all charges for title and settlement service to "Title Exam" or "Abstract" because those fees are excluded from, and do not raise, the APR.  *See, e.g.*, June 6, 2011 e-mail, attached as **Exhibit 15**; September 24, 2015 e-mail, attached as **Exhibit 16**; October 6, 2015 e-mail, attached as **Exhibit 17**.

142.    Emery participates in and ratifies this false allocation of fees.  *See* **Exhibit 18**, Jan. 12, 2012 e-mail regarding Emery loan stating that settlement fees affect the APR.

143.    For example, despite conducting a settlement or closing with each borrower, All Star and Emery choose not to allocate any amount of All Star's charges associated with a borrower's loan to "settlement or closing fee" because that charge is included in the APR.  Instead, All Star and Emery allocate all charges, including that portion attributable to conducting a settlement or closing, to "Title Exam", "Abstract", or "Title Insurance", which are excluded from the APR.

144.    In some instances, where a lender limited All Star's ability to falsely allocate charges title exam and abstract, All Star falsely allocates fees to other categories, such as "Attorney

Fee" and "Doc Prep" which are also excluded from APR. *See* 12 C.F.R. § 1026.4(c)(7)(ii).  This false allocation of fees was not related in any way to the actual provision or cost of the title or settlement service, and was for the sole purpose of charging the borrower the highest amount of title and settlement service fees as possible without revealing the  unnecessarily increased fees in the APR. *See* Feb. 24, 2012 email from All Star President J. Horwitz to loan processor D. Tabler, attached as **Exhibit 22.**

145.    Based on this continuing pattern of practice, Plaintiffs believe, and therefore allege, that All Star and Emery engage in the false allocation and manipulation of the APR throughout the time period Emery is participating in the All Star Scheme.

146.    The choice by Emery and All Star to falsely allocate fees resulted in the fraudulent reporting of false APRs and the false, and falsely minimized, representation of the cost of the Emery loan to borrowers.

147.    Emery's and All Star's choice to falsely allocate fees and fraudulently report these false allocations in borrowers' loan documents concealed from borrowers the fixed and fraudulent charges, the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance thereof.   It also affirmatively prevented borrowers from discovering the fixed and fraudulent charges through comparison to other loans.

148.    As a regular business practice, All Star uses various software programs, including Titlehound, to produce borrower loan documents, including documents reporting the APRs associated with a loan.  All Star causes this software, including Titlehound, to be programmed to make these false allocations of title and settlement service fees and the resulting false APR calculations, and to produce Emery's loan documents to present to borrowers and on which Emery and All Star intended borrowers to rely.

149.     The choice by Emery and All Star to falsely allocate fees and manipulate and falsely report APRs fraudulently concealed from borrowers the Kickback Agreement and the fixed and fraudulent charges, and affirmatively prevented borrowers from discovering their injuries resulting therefrom.

**III.     Emery and All Star Make False Representations on Borrowers' Loan Documents.**

150.     In addition to false representations in marketing communications to borrowers and the misrepresentation of APRs, Emery and All Star make false representations on borrowers' loan documents.

151.     At all relevant times, federal law requires Emery, as lender or broker, to provide a GFE to the borrower within three days of taking a loan application. 12 C.F.R. § 1024.7(a)-(b). "The required standardized GFE form must be prepared completely and accurately." 12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

152.     Block 4 of the GFE is to state only the charges for "title services and lender's title insurance."

153.     As a regular pattern of practice, Emery falsely includes in Block 4 charges that are not title services and lender's title insurance, including the Kickback Overcharge, including the fraudulent "overages" described in ¶¶ 84-85, which are not associated with any legitimate title or settlement service and are charged for the sole purpose of funding the illegal kickbacks.

154.     By falsely including these charges in Block 4 of the GFE, Emery conceals from borrowers: (i) the illegal kickback; (ii) the fact and amount of the Kickback Overcharge; and (iii) the coordinated business relationship between Emery and All Star under the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star performs with Emery in furtherance thereof.

155.    In addition, the loan originator must state in Block 1 of the Good Faith Estimate:

[A]ll charges that loan originators involved in this transaction will receive, except for any charge for the specific interest rate chosen (points). A loan originator may not separately charge any additional fees for getting this loan, including for application, processing, or underwriting. The amount stated in Block 1 is subject to zero tolerance, *i.e.,* the amount may not increase at settlement.

12 C.F.R. App'x C to Part 1024 – Instructions for Completing the Good Faith Estimate (GFE) Form.

156.    As a regular pattern of practice, Emery falsely fails to report the Kickback Overcharge, including the fraudulent "overages" described in ¶¶ 84-85,  in Block 1 of the GFE even though the Emery and Kickback Overcharges are charges Emery would receive in the transaction.

157.    Emery's omission of the Kickback Overcharge from Block 1 of the GFE conceals from borrowers (i) the illegal kickback; (ii) the fact and amount of the Kickback Overcharges; and (iii) the coordinated business relationship between Emery and All Star under the Kickback Agreement, the agreement fixing prices, and the pattern of racketeering activity All Star performs with Emery in furtherance of the All Star Scheme.

158.    In addition to the GFE, federal law, at all relevant times, required each borrower to receive a HUD-1 at the closing or settlement of a loan.  The settlement agent produces the HUD-1, but federal regulations require the lender or broker to provide to the settlement agent all information appearing in the HUD-1 statement.

159.    Section 1100 of the HUD-1 reports to the borrower the title and settlement services provided on the loan, along with the associated charges to the borrowers for those services.

160.    As a continuing pattern and regular business practice, Emery and All Star choose and cause the false allocation of fees described in ¶¶ 137-149 to repeat and appear on Emery borrowers' HUD-1 statements in Section 1100.

161.    As a continuing pattern and regular business practice, Emery chooses not to describe anywhere on a borrower's HUD-1 the amount of the kickback received by Emery related to the borrower's loan or the fact that All Star has paid a kickback to Emery for the assignment and referral of the borrower's loan.  Emery is required to report the kickback Line 808 of the HUD-1, and perhaps other lines.

162.    As a continuing pattern of practice, Emery chooses not to describe anywhere on a borrower's HUD-1 that the borrower is being charged or the amount of any Kickback Overcharge, Kickback Surcharge, or other flat fees associated with the fixed and fraudulent charges.  Emery is required to report these amounts in Section 1100 or Section 1300 of the HUD-1.

163.    As a continuing pattern of practice, Emery chooses to omit and fails to describe anywhere on a borrower's HUD-1 statement that the borrower is being charged a Kickback Overcharge, "overage" or other fee associated with the Kickback Agreement and/or the related scheme to defraud. Emery is required to itemize these amounts in the in Section 1100 or Section 1300 of the HUD-1. Instead, Emery chooses to omit any description of the Kickback Overcharge, "overage" or other fraudulent charge from these sections and fraudulently lumps the amount of the Kickback Overcharge into the amounts associated with legitimate title and settlement services, such as title examination and/or abstract. This is fraudulent because the amounts comprising the Kickback Overcharge are not associated with any legitimate title and settlement service and charged solely for the purpose of paying for illegal kickbacks.

164.    Lenders authorized to underwrite government insured or guaranteed loans – such as VA or FHA loans—use charts regularly used in the industry listing the Mean, Median, and 80th percentile of settlement services charges by state to measure a "reasonable and customary" settlement service fee per 24 C.F.R. §

203.27.

165.    These authorized lenders require their mortgage broker correspondents and wholesalers, like Emery, to follow these charts.

166.    More than 1,330 loans – or 78% of all loans - assigned and referred by Emery to All Star during the period of the All Star Scheme were VA or FHA loans.  Emery was required to certify that the charges on these loans complied with these requirements that settlement charges be no greater that the reasonable and customary charge  per 24 C.F.R. §203.27 and 24 C.F.R. §203.255.  This certification is presented to borrowers on the "Direct Endorsement" form.

167.    As a regular business practice, Emery falsely certified borrowers' Direct Endorsement. These certifications were false because the fees charged borrowers did not comply with HUD regulations because the charges resulting from the Kickback Agreement and related scheme to defraud are unnecessarily increased by the Kickback Overcharge, are not reasonable and customary, and included amounts not associated with any legitimate title and settlement service

168.    In addition, in some instances the false allocation of fees, described in ¶ 144 caused borrowers on VA loans to be charged and pay fees that were not permitted under those program requirements, including document preparation fees, attorney fees,  and settlement fees. *See* 38 C.F.R. §36.4313.  Emery's certification of the Direct Endorsement on these loans are additionally false because the fees were not permitted and did not comply with HUD regulations.

169.    These false representations and omissions, presented to Emery borrowers by All Star – as Emery's agent – at closing, fraudulently conceal: (i) the illegal kickbacks; (ii) the fact and amount of the Kickback Overcharges and the fact that borrowers are being charged an amount not associated with a legitimate title and settlement service; (iii) the coordinated business relationship between Emery and All Star under the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity Emery and All Star conduct in furtherance of thereof, as well as the fact of Emery borrowers' actual damages and injury therefrom.

**IV.    Plaintiffs exercise reasonable diligence before, during, and after the closing of their loans.**

170.    As a result of the fraudulent concealments by Emery and All Star, the Ellis Plaintiffs, Brown, and Taylor (and all members of the alleged Class) had no actual notice before, at or after the closing of their loans of the illegal kickbacks and the Kickback Agreement, the exchange of any "thing of value" between Emery and All Star, the Kickback Overcharges and/or Surcharges, or the coordinated business relationship of Emery and All Star under the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity Emery and All Star conduct in furtherance thereof.

**A.  The Ellis Plaintiffs are reasonably diligent.**

171.    The Ellis Plaintiffs exercised reasonable diligence before, during, and after the closing of their loan.

172.    The Ellis Plaintiffs receive loan documents prepared by Emery in advance of their closing and review those loan documents.

173.    The Ellis Plaintiffs pre-closing loan documents include a Good Faith Estimate prepared by Emery.

174.    Emery chooses to omit from the Ellis Plaintiffs' Good Faith Estimate any description or statement of the coordinated business relationship between Emery and All Star and include the fraudulent representations and omissions described in ¶¶ 150-158. The Ellis Plaintiffs believe, and therefore allege that their Good Faith Estimate does not identify All Star as the provider of any title settlement service related to their refinance.

175.    Emery and All Star choose to include in the Ellis Plaintiffs' pre-closing documents Emery and All Star's false allocation of fees and a false APR as described in ¶¶ 137-149.

176.    Emery and All Star choose to make the false statements and omissions in the Ellis Plaintiffs' pre-closing loan documents for the purposes of concealing, and did so conceal from the Ellis Plaintiffs, the coordinated business relationship between Emery and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to the Ellis Plaintiffs' loan, the fraudulent nature of the charges to the Ellis Plaintiffs for title and settlement services, and the fact and amount of any component of the Kickback Overcharge applicable to their Emery loan.

177.    As is reasonable under the circumstances, the Ellis Plaintiffs believe these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and the Ellis Plaintiffs, did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of the Ellis Plaintiffs' loan for title and settlement services; or (iii) the prices they will be charged for title and settlement services are the result of Kickback Agreement between Emery and All Star, the related scheme to defraud, or a pattern of racketeering activity conducted in furtherance thereof.

178.    The Ellis Plaintiffs act diligently during the closing or settlement of their loan.  As a condition of funding their loan, Emery requires the Ellis Plaintiffs to participate in a closing, and

the Ellis Plaintiffs attend and fully participate in the required closing and review all documents with All Star's representative.

179.     At the closing of their loan, the Ellis Plaintiffs receive from All Star, or its agent, several documents, including a HUD-1.  The Ellis Plaintiffs review and sign all of the documents All Star presents at the closing, including the HUD-1.

180.     Emery and All Star omit from the documents the Ellis Plaintiffs receive at closing, including their HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under the Kickback Agreement and/or the related scheme to defraud.

181.     Emery and All Star choose to omit from the documents the Ellis Plaintiffs receive at closing, including their HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Emery related to the Ellis Plaintiffs' loan.

182.     Emery and All Star choose to include in the documents the Ellis Plaintiffs receive at closing, including their HUD-1, the false allocation of fees as described in  ¶¶ 137-149 and the resulting fraudulent representations and omissions as described in ¶¶ 159-163.

183.     Emery and All Star include in the documents the Ellis Plaintiffs receive at closing the false certification described in ¶¶ 164-168.

184.     Emery and All Star make the fraudulent omissions and representations and false certifications in the Ellis Plaintiffs' loan closing documents for the purposes of concealing, and did so conceal from the Ellis Plaintiffs, the coordinated business relationship between Emery and All Star, the Kickback Agreement and related scheme to defraud, the fact, nature, and amount of the illegal kickback related to the Ellis Plaintiffs' loan, the Kickback Overcharge applicable to the Ellis' Emery loan, and the Ellis Plaintiffs' injuries and actual damages therefrom.

185.     As is reasonable under the circumstances, the Ellis Plaintiffs believe these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and the Ellis Plaintiffs do not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of the Ellis Plaintiffs' loan for title and settlement services; (iii) the prices charged for title and settlement services are fraudulent and the result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

186.     The Ellis Plaintiffs act diligently after their closing. On or around March 12, 2020, the Ellis Plaintiffs receive a letter from undersigned counsel describing an investigation of All Star and Emery.  This is the Ellis Plaintiffs' first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

187.     Within days, the Ellis Plaintiffs contact and retain counsel.  The Ellis Plaintiffs file this Complaint within months of becoming aware of facts giving rise to their causes of action.

**B.  Ms. Brown is reasonably diligent.**

188.     Brown exercised reasonable diligence before, during and after the closing of her loan.

189.     Brown receives loan documents prepared by Emery in advance of her closing and reviews those loan documents.

190.     Brown's pre-closing documents include a Good Faith Estimate prepared by Emery. *See* Brown Good Faith Estimate attached as **Exhibit 20**.

191.     Emery chooses to omit from Brown's Good Faith Estimate any description or statement of the coordinated business relationship between Emery and All Star and includes the

fraudulent representations and omissions described in ¶¶ 150-158.  Brown's Good Faith Estimate does not identify All Star as the provider of any title and settlement services related to her refinance. **Ex.t 20**.

192.    Emery and All Star choose to include in Brown's pre-closing documents Emery and All Star's false allocation of fees and a false APR as described in ¶¶ 137-149.

193.    Emery and All Star choose to make the false statements and omissions in Brown's pre-closing loan documents for the purposes of concealing, and did so conceal from Brown, the coordinated business relationship between Emery and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to Brown's loan, the fraudulent nature of the charges to Brown for title and settlement services, and the fact and amount of any component of the Kickback Overcharge applicable to her Emery loan.

194.    As is reasonable under the circumstances, Brown believes these pre-closing documents and the representations made therein.  A reasonable borrower would have no reason to believe, and Brown did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Brown's loan for title and settlement services; or (iii) the prices she will be charged for title and settlement services are the result of Kickback Agreement between Emery and All Star, the related scheme to defraud, or a pattern of racketeering activity conducted in furtherance thereof.

195.    Brown acts diligently during the closing or settlement of her loan.  As a condition of funding her loan, Emery requires Brown to participate in a closing, and Brown attends and fully participates in the required closing and reviews all documents with All Star's representative.

196.     At the closing of her loan, Brown receives from All Star, or its agent, several documents, including a HUD-1.  **Ex. 19.** Brown reviews and signs all of the documents All Star presents at the closing, including the HUD-1.

197.     Emery and All Star omit from the documents Brown receives at closing, including her HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under the Kickback Agreement and/or the related scheme to defraud.  **Ex. 19**.

198.     Emery and All Star choose to omit from the documents Brown receives at closing, including her HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Emery related Brown's loan.  **Ex. 19.**

199.     Emery and All Star choose to include in the documents that Brown receives at closing, including her HUD-1, the false allocation of fees as described in ¶¶ 137-149  and the resulting fraudulent representations and omissions as described in  ¶¶ 159-163.

200.     Emery and All Star include in the documents Brown receives at closing the false certification described in ¶¶ 164-168.

201.     Emery and All Star make the fraudulent omissions and representations and false certifications in Brown's loan closing documents for the purposes of concealing, and did so conceal from Brown, the coordinated business relationship between Emery and All Star, the Kickback Agreement and related scheme to defraud, the fact, nature, and amount of the illegal kickback related to Brown's loan, the Kickback Overcharge applicable to Brown's Emery loan, and Brown's injuries and actual damages therefrom.

202.     As is reasonable under the circumstances, Brown believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Brown did not believe, that: (i) a coordinated business relationship exists between Emery and All

Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Brown's loan for title and settlement services; (iii) the prices charged for title and settlement services are fraudulent and the result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

203. Brown acts diligently after her closing. On or around February 22, 2021, Brown receives a letter from undersigned counsel describing an investigation of All Star and Emery. This is Brown's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

204. Within days, Brown contacts and retains counsel. Brown files this Complaint within weeks of becoming aware of facts giving rise to her causes of action.

## C. Mr. Taylor is reasonably diligent.

205. Taylor exercised reasonable diligence before, during, and after the closing of his loan.

206. Taylor receives loan documents prepared by Emery in advance of his closing and reviews those documents.

207. Taylor's pre-closing loan documents include a Good Faith Estimate prepared by Emery. *See* Taylor Good Faith Estimate attached as **Exhibit 23.**

208. Emery chooses to omit from Taylor's Good Faith Estimate any description or statement of the coordinated business relationship between Emery and All Star and include the fraudulent representations and omissions described in ¶¶ 150-158. Taylor's Good Faith Estimate does not identify All Star as the provider of any title settlement service related to his refinance.

209. Emery and All Star choose to include in Taylor's pre-closing documents Emery and All Star's false allocation of fees and a false APR as described in ¶¶ 137-149.

210. Emery and All Star choose to make the false statements and omissions in Taylor's pre-closing loan documents for the purposes of concealing, and did so conceal from Taylor, the coordinated business relationship between Emery and All Star, the Kickback Agreement, the fact, nature and amount of the illegal kickbacks related to Taylor's loan, the fraudulent nature of the charges to Taylor for title and settlement services, and the fact and amount of any component of the Kickback Overcharge applicable to his Emery loan.

211. As is reasonable under the circumstances, Taylor believes these pre-closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Taylor did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Taylor's loan for title and settlement services; or (iii) the prices he will be charged for title and settlement services are the result of Kickback Agreement between Emery and All Star, the related scheme to defraud, or a pattern of racketeering activity conducted in furtherance thereof.

212. Taylor acts diligently during the closing or settlement of his loan. As a condition of funding his loan, Emery requires Taylor to participate in a closing, and Taylor attends fully and participates in the required closing and reviews all documents with All Star's representative.

213. At the closing of his loan, Taylor receives from All Star, or its agent, several documents, including a HUD-1. Taylor reviews and signs all of the documents All Star presents at the closing, including the HUD-1.

214. Emery and All Star omit from the documents Taylor receives at closing, including his HUD-1, any description or statement of the coordinated business relationship between Emery and All Star under the Kickback Agreement and/or the related scheme to defraud.

- 56 -

215.   Emery and All Star choose to omit from the documents Taylor receives at closing, including his HUD-1, any description or statement of any payment, amount or thing of value that was paid by All Star to Emery related to Taylor's loan.  **Ex. 21.**

216.   Emery and All Star choose to include in the documents Taylor receives at closing, including his HUD-1, the false allocation of fees as described in ¶¶ 137-149 and the resulting fraudulent representations and omissions as described in ¶¶ 159-163. **Ex. 21.**

217.   Emery and All Star include in the documents Taylor receives at closing the false certification described in ¶¶ 164-168.

218.   Emery and All Star make the fraudulent omissions and representations and false certifications in Taylor's loan closing documents for the purposes of concealing, and did so conceal from Taylor, the coordinated business relationship between Emery and All Star, the Kickback Agreement and related scheme to defraud, the fact, nature, and amount of the illegal kickback related to Taylor's loan, the Kickback Overcharge applicable to Taylor's Emery loan, and Taylor's injuries and actual damages therefrom.

219.   As is reasonable under the circumstances, Taylor believes these closing documents and the representations made therein. A reasonable borrower would have no reason to believe, and Taylor did not believe, that: (i) a coordinated business relationship exists between Emery and All Star; (ii) there has been any payment or exchange of a thing of value between Emery and All Star related to the assignment and referral of Taylor's loan for title and settlement services; (iii) the prices charged for title and settlement services are fraudulent and the result of the Kickback Agreement, the related scheme to defraud, and the pattern of racketeering activity All Star and Emery conduct in furtherance of thereof.

220.    Taylor acts diligently after his closing. On or around February 22, 2021, Taylor receives a letter from undersigned counsel describing an investigation of All Star and Emery.  This is Taylor's first indication of any potential wrongful, illegal, and/or actionable conduct by anyone.

221.    Within days, Taylor contacts and retains counsel. Taylor files this Complaint within weeks of becoming aware of the facts giving rise to his causes of action.

**V.      Accrual and  tolling of limitations.**

222.    The limitations period provided in 15 U.S.C. §15(b), applicable to claims pursuant to 18 U.S.C. §1964**,** is subject to the discovery of injury rule. *Detrick v. Panalpina,* 108 F.3d 529 (4th Cir. 1997) *cert. denied* 1997 U.S. LEXIS 4626.  Emery's affirmative and fraudulent acts precluded Emery borrowers, including Plaintiffs and Class Members, from discovering their actual damages and injuries caused by the pattern of racketeering activity that Emery and All Star conduct in furtherance of the related scheme to defraud.

223.    As a result, Plaintiffs', and Class Members', claims pursuant to 18 U.S.C. § 1964 did not accrue, for the purpose of the limitations period provided in 15 U.S.C. § 15(b), until such time as Plaintiffs, and Class Members, knew, or should have known, of their injury – for the Ellis Plaintiffs on or about March 12, 2020 and for Brown and Taylor on or about February 19, 2021.

224.    In addition and in the alternative, as a result of Emery's and All Star's fraudulent concealments and Plaintiffs' reasonable diligence before, during, and after the closing of their loans, the statute of limitations as to all causes of action pled herein are and should be tolled beginning on the date of  Plaintiffs' loan closing and continuing until the learning of facts giving rise to the causes of action pled herein – for the Ellis Plaintiffs on or around March 12, 2020, and for Brown and Taylor, on or around February 19, 2021.

225.     Plaintiffs believe, and therefore aver, that the fraudulent concealments described herein were an integral component of the All Star Kickbacks, the Kickback Agreement, the related scheme to defraud, and typical of all Class Members' transactions such that all Class Members are entitled to fraudulent concealment tolling of applicable limitations period.

## COUNT I
### Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(a)

226.     Plaintiffs incorporate the above stated paragraphs as if restated herein.

227.     All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, et seq.

228.     Emery, by and through its brokers, loan officers, employees and/or agents, received and accepted things of value paid by All Star in exchange for the assignment and referral of business to All Star in violation of RESPA, 12 U.S.C. § 2607(a).

229.     All loans referred to All Star under the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by Emery and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

230.     The payment and/or arranging of payment of kickbacks to Emery by All Star and Emery's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

231.     The payments from All Star to Emery were not associated with any good, facility or service actually provided by Emery, or any of its agents and/or employees, to All Star, and in

addition or in the alternative, the value of any good, facility or service provided claimed to be provided by Emery to All Star is not reasonably related to the payment from All Star such that the payment is not "bona fide" or within the protection of 12 U.S.C. §2607(c)(2).

232.    In addition, All Star's laundering of money through the third-party marketing companies was always solely expressly payments to Emery for the assignment and referral of Emery loans and to conceal the illegal kickbacks, and not for the third-party marketing company's provision of any goods or services to All Star.

233.    In the alternative, any payment made by All Star to Emery and/or laundered through any third party marketing company is far greater, and not reasonably related, to All Star's nominal presence in the solicitations and were in reality simply kickbacks designed to look like legitimate payments.

234.    Plaintiffs allege claims for violations of 12 U.S.C. §2607(a) on their own behalf and pursuant to Fed. R. Civ. P. 23 with the class defined as follows:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated, brokered or otherwise obtained from Emery Federal Credit Union for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2011, and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2011 through December 31, 2014, was an employee, officer, member and/or agent of Emery Federal Credit Union (the "RESPA Class").

235.    There are questions of law and fact common to the claims of each and all members of the RESPA Class. These common questions include, but are not limited to:

> a.    Whether there existed a referral agreement between Emery and All Star whereby Emery agreed to assign and refer Emery loans, refinances, and reverse mortgages to All Star in return for kickbacks;
>
> b.    Whether Emery and its employees and/or agents received illegal kickbacks from All Star for the assignment and referral of business to All Star;

    c.      Whether the illegal kickbacks to Emery and its employees and/or agents violated RESPA;

    d.      Whether Emery and All Star used third party marketing companies to launder kickbacks related to Emery loans;

    e.      Whether Plaintiffs and RESPA Class Members were forced to pay higher and unnecessarily increased charges for settlement services;

    f.      Whether Emery used sham invoices and payment records to actively and fraudulently conceal the payment, receipt and acceptance of illegal kickbacks;

    g.      Whether Emery disclosed or described to any borrower its coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Emery and All Star related to any borrower's loan;

    h.      Whether Emery disclosed or described on any borrowers "Good Faith" Estimate, HUD-1 or other loan document Emery' coordinated business relationship with All Star or the fact that a thing of value had been exchanged between Emery and All Star related to any borrower's loan;

    i.      Whether despite exercising reasonable due diligence, Plaintiffs and RESPA Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

    j.      Whether Plaintiffs and RESPA Class Members are entitled to treble damages under RESPA; and

    k.      Whether Plaintiffs and RESPA Class Members are entitled to attorneys' fees and expenses under RESPA.

236.    These common issues of law and fact predominate over any question affecting only individual RESPA Class Members.

237.    Plaintiffs' transaction and claims are typical of the claims or defenses of the respective RESPA Class Members and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

238.    Plaintiffs will fairly and adequately protect the interests of the RESPA Class. Plaintiffs' interests and the interests of all other members of the RESPA Class are identical.

239. Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class and settlement class counsel in multiple U.S. District Courts in similar litigation, and will adequately represent the RESPA Class' interests.

240. The RESPA Class consists of borrowers on more than 1,700 loans, and thus are so numerous that joinder of all members is impracticable.

241. Separate actions by individual members of the class would create a risk of inconsistent of varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendant.

242. This action entails questions of law and fact common to RESPA Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

243. Most members of the RESPA Class are unaware of their rights to prosecute a claim against Emery.

244. No member of the RESPA Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

### COUNT II
### Violations of Racketeer Influenced & Corrupt Organizations Act (RICO)
### 18 U.S.C. §1962

245. Plaintiffs incorporate the above stated paragraphs as if restated herein.

246. Emery is a "person" for the purposes of 18 U.S.C. §1962(a).

247. Emery and All Star associate in fact and form an enterprise (the "Enterprise") for the purpose of 18 U.S.C. § 1962(a). For a continuous period of at least eighteen months, Emery and All Star associate and commit the predicate acts pled herein, which acts are separate and in

addition to their legitimate mortgage and settlement service operations, for the common purpose of defrauding borrowers into paying fixed and fraudulent prices for title and settlement services and to pay amounts not associated with any legitimate title or settlement services and to thereby deprive borrowers of their money and/or property. The activities of the Enterprise affect interstate commerce across more than 30 states.

248.    The more than 200,000 uses of the interstate U.S. Mail and wires by Emery and All Star in furtherance of the scheme to defraud constitute mail and wire fraud as defined under 18 U.S.C. §§ 1341 and 1343, serve as predicate acts, and constitute a pattern of racketeering activity.

249.    Emery received income derived from this pattern of racketeering activity in the form of the kickbacks paid by All Star to Emery, and through the interest, fees and other income earned on Emery mortgages, refinances and reverse mortgages resulting from the pattern of racketeering activity.

250.    Emery improperly used and invested the income it received from the pattern of racketeering activity in furtherance of the activities of the Enterprise and for the purpose of luring borrowers into the scheme to defraud in violation of 18 U.S.C. § 1962(a).

251.    As a direct and proximate result of the RICO scheme to defraud and Emery's pattern of racketeering activity in furtherance thereof, Plaintiffs and Class Members were injured and suffered actual damages in the amount of at least $200.

252.    Plaintiffs allege claims pursuant to 18 U.S.C. § 1964(c) on their own behalf and pursuant to Fed. R. Civ. P. 23 for violations of 18 U.S.C. § 1962(a) ("RICO Class"), with the alleged RICO Class defined as:

> All individuals in the United States who were borrowers on a loan originated, brokered or otherwise obtained from Emery Federal Credit Union for which All Star Title, Inc. provided a settlement service, as identified in Section 1100 on the borrower's HUD-1, between January 1, 2011, and December 31, 2014. Exempted

from this class is any person who, during the period of January 1, 2011 and December 31, 2014, was an employee, officer, member and/or agent of Emery Federal Credit Union or All Star Title, Inc.

253. The RICO Class consists of borrowers on more than 1,700 loans, and thus are so numerous that joinder of all members is impracticable.

254. There are questions of law and fact common to the claims of each and all members of the RICO Class. These common questions include, but are not limited to:

a. Whether Emery and All Star formed an enterprise;

b. Whether the activities of the Enterprise affected interstate commerce;

c. Whether one purpose of the scheme to defraud was to deprive borrowers of money or property;

d. Whether Emery and All Star used the interstate U.S. Mail in furtherance of the activities of the Enterprise including the scheme to defraud,

e. Whether Emery and All Star used the interstate wires in furtherance of the activities of the Enterprise including the scheme to defraud;

f. Whether Emery received income from a pattern of racketeering activity;

g. Whether Emery used income derived from a pattern of racketeering activity in support of, or in furtherance of, the activities of the Enterprise, including the scheme to defraud;

h. Whether Emery actively conceal the scheme to defraud and resulting fraudulent charges and Kickback Overcharges;

i. Whether Plaintiffs and RICO Class members knew or should have known of their injuries resulting from Emery' violation of 18 U.S.C. §1962(a);

j. Whether Emery' and All Star's fraudulent concealments prevented Plaintiffs and RICO Class members from discovering their injuries proximately caused by Emery' pattern of racketeering activity;

k. Whether Plaintiffs and the RICO Class are entitled to treble damages pursuant to 18 U.S.C. §1964(c); and

l. Whether Plaintiffs and the RICO Class are entitled to attorneys' fees and expenses pursuant to 18 U.S.C. §1964(c).

255.     These common issues of law and fact predominate over any question affecting only individual RICO Class Members.

256.     Plaintiffs' transaction and claims are typical of the claims or defenses of the respective RICO Class Members.

257.     Plaintiffs will fairly and adequately protect the interests of the RICO Class. The interests of the named Plaintiffs and all other members of the RICO Class are identical.

258.     Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the RICO Class's interests.

259.     Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendant.

260.     This action entails questions of law and fact common to RICO Class Members that predominate over any questions affecting only individual plaintiffs; therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

261.     Most members of the RICO Class are unaware of their rights to prosecute a claim against Emery.

262.     No member of the RICO Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

**WHEREFORE**, Plaintiffs respectfully demand:

    a.   This Court certify the RESPA and/or RICO Classes pursuant to
         Federal Rule of Civil Procedure 23 and set this matter for trial;

b.  Judgment for Plaintiffs and RESPA Class Members against Emery Federal Credit Union and award Plaintiffs and RESPA Class Members and amount equal to three times the amount of any charges paid for such settlement services, pursuant to pursuant to 12 U.S.C. § 2607(d)(2);

c.  Judgment for Plaintiffs and RICO Class Members against Emery Federal Credit Union, and award Plaintiffs and RICO Class Members damages in the amount equal to three times the actual damages caused by Emery's scheme to defraud and the pattern of racketeering activity conducted in furtherance thereof;

d.  Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5), 15 U.S.C. § 15(a) and 18 U.S.C. § 1964(c); and

e.  For such other and further relief as this Court deems proper.

**[SIGNATURES ON THE FOLLOWING PAGE]**

Dated: March 8, 2021

Respectfully submitted,

_____/s/_____
Timothy F. Maloney, Esq. #03381
Veronica B. Nannis, Esq. #15679
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 / (301) 220-1214 (fax)
Email: tmaloney@jgllaw.com
Email: vnannis@jgllaw.com
*Counsel for Plaintiffs and Class Members*

_____/s/_____
Michael Paul Smith, Esq. #23685
Melissa L. English, Esq. #19864
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
Email: menglish@sgs-law.com
*Counsel for Plaintiffs and Class Members*

_____/s/_____
Gregory M. Utter, Esq. (*Pro Hac Vice Forthcoming*)
Melissa S. Matthews, Esq. (*Pro Hac Vice Forthcoming*)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
(513) 579-6540 / (513) 579-6457 (fax)
Email: gmutter@kmklaw.com
Email: mmatthews@kmklaw.com
*Counsel for Plaintiffs and Class Members*

## <u>PRAYER FOR JURY TRIAL</u>

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| Email: vnannis@jgllaw.com | Email: menglish@sgs-law.com |
| *Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |

_____/s/_____
Gregory M. Utter, Esq. (*Pro Hac Vice Forthcoming*)
Melissa S. Matthews, Esq. (*Pro Hac Vice Forthcoming*)
Keating Muething & Klekamp, PLL
1 East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
(513) 579-6540 / (513) 579-6457 (fax)
Email: gmutter@kmklaw.com
Email: mmatthews@kmklaw.com
*Counsel for Plaintiffs and Class Members*